1    **James P. Laurick, WSBA #33320**
     **jlaurick@kilmerlaw.com**
2    Kilmer, Voorhees & Laurick, P.C.
     2701 NW Vaughn Street, Suite 780
3    Portland, Oregon 97210
     Telephone: (971) 634-1132
4    Fax: (503) 222-5290

5    OF ATTORNEYS FOR CREDITOR
     WELLS FARGO BANK, N.A.

| | |
|---|---|
| Judge : | Hon. Christopher M. Alston |
| Chapter : | 7 |
| **Hearing Date** : | January 29, 2025 |
| **Hearing Time** : | 9:30 a.m. |
| **Location** : | **Everett** |
| **Response Deadline** : | January 22, 2025 |

6

7

8

9

10           UNITED STATES BANKRUPTCY COURT

11       WESTERN DISTRICT OF WASHINGTON AT SEATTLE

12   In re:

13   Michael Lenning,

14             Debtor.

15

16

17

Case No. 24-12533-CMA

Chapter 7

**DECLARATION OF WELLS FARGO BANK, N.A. IN SUPPORT OF MOTION FOR RELIEF FOR WELLS FARGO BANK, N.A.**

18       I, Raymond Mada, declare:

19       I am a citizen of the United States of America, am over the age of 18 years, and am

20 competent to make this declaration. I am the representative of Creditor Wells Fargo Bank, N.A.

21 in this action. I submit this declaration in support of the motion for relief from the automatic

22 stay and based on personal knowledge and a review of pertinent records maintained in the

23 ordinary course of business. I am Loan Workout Manager of the group in which this account is

24 placed.

25       Creditor Wells Fargo Bank, N.A. ("Wells Fargo") is moving the Court for relief from the

26 automatic stay associated with this bankruptcy on the following basis.

DECLARATION OF WELLS FARGO BANK, N.A. IN SUPPORT
OF MOTION FOR RELIEF FOR WELS FARGO BANK, N.A. - 1

KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(971) 634-1132 · FAX (503) 222-5290

1      **Introduction**. Debtor Michael Lenning and Ariel Lenning are guarantors of debt owed

2 by their PLLC known as Novel Eyes, PLLC to Creditor Wells Fargo. Both Debtor Michael

3 Lenning and Ariel Lenning have filed separate Chapter 7 bankruptcies in this district. Her case

4 no. is 24-12451-CMA. This motion for relief is filed because, to the knowledge of Wells Fargo,

5 Ariel Lenning has possession of the collateral securing the Wells Fargo loan to Novel Eyes,

6 PLCC, guaranteed by both the Lennings. In addition, both of the Lennings make reference to the

7 business loan collateral. Ariel Lenning as indicated no opposition to this motion.

8    **1. Debt, Default, Description and Value of Collateral:**

9    a. Description of collateral: Wells Fargo has a first perfected security interest in the

10         following items of Debtor's business known as Novel Eyes PLLC ("collateral"):

11            (1)   All Accounts, Chattel Paper, and other rights to payment of the

12                  borrower and Debtor (and Ariel Lenning bankruptcy case no.24-

13                  12451-CMA), whether now owned or hereafter acquired;

14            (2)   All Inventory of the borrower and Debtor (and Ariel Lenning

15                  bankruptcy case no.24-12451-CMA), whether now owned or

16                  hereafter acquired;

17            (3)   All Equipment of the borrower and Debtor (and Ariel Lenning

18                  bankruptcy case no.24-12451-CMA), whether now owned or

19                  hereafter acquired;

20            (4)   All General Intangibles and Contract Rights of the borrower and

21                  Debtor (and Ariel Lenning bankruptcy case no.24-12451-CMA),

22                  including without limitation all patient records and patient charts,

23                  whether now owned or hereafter acquired;

24            (5)   All of the above, together with all substitutions and replacements for

25                  and products of any of the foregoing personal property, together with

26                  all accessions, attachments, parts, and

DECLARATION OF WELLS FARGO BANK, N.A. IN SUPPORT
OF MOTION FOR RELIEF FOR WELS FARGO BANK, N.A. - 2

KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(971) 634-1132 · FAX (503) 222-5290

Case 24-12533-CMA    Doc 12    Filed 12/19/24    Ent. 12/19/24 14:38:55    Pg. 2 of 24

1    b. Amount of debt: $469,351.65 on or before October 3, 2024.

2    c. There is no equity in the collateral and the Debtor has indicated a desire to surrender the

3       collateral to Wells Fargo. Wells Fargo obtained an inspection and valuation on June 25,

4       2024, which placed a value of $193,500 on the remaining equipment. Wells Fargo has

5       not seen or inspected the collateral since then but continues to estimate its value is less

6       than the debt owed. Debtor also appears to estimate the value to be less than the debt

7       owed.

8    Wells Fargo filed suit against Novel Eyes PLLC, Debtor and Ariel Lenning to recover the

9    amount owed and the collateral in Superior Court, Snohomish County, Case No. 24-2-06325-31.

10   That action is subject to the automatic stay at least as to Debtor and Ariel Lenning.

11   **2. Relief from Stay Should be Granted Because:**

12   There is no equity and the collateral is not necessary for a successful reorganization. Wells Fargo

13   is also concerned that there may be a lack of insurance on the collateral.

14   **3. Background:**

15       (1)  Debtor filed his Chapter 7 petition on October 3, 2024 (Ariel filed her

16            petition on September 27, 2024.

17       (2)  Wells Fargo has a lien on the collateral by virtue of its loan agreement,

18            security agreement and UCC Financing Statement, copies of which are

19            attached hereto, as Exhibits 1-4.

20   **4. Relief Requested:**

21       (1)  Wells Fargo requests relief from the automatic stay to allow it to foreclose

22            its lien on the collateral and to take any necessary action to obtain

23            possession of the collateral.

24       (2)  Wells Fargo requests that the 14-day stay provided by FRBP 4001(a)(3)

25            be waived based on the following cause: debtor seeks to surrender the

26            collateral and the collateral may not be insured.

DECLARATION OF WELLS FARGO BANK, N.A. IN SUPPORT
OF MOTION FOR RELIEF FOR WELS FARGO BANK, N.A. - 3

KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(971) 634-1132 · FAX (503) 222-5290

**5. Documents:**

Wells Fargo has attached to and filed with this motion a copy of the documents creating and

perfecting the security interest as Exhibits 1-4. Also attached are the two guarantees of Ariel

Lenning and Michael Lenning as Exhibits 5 and 6.

**I HEREBY DECLARE THAT THE ABOVE STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND THAT IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.**

DATED: December 18, 2024

_Raymond Mada_
_12/18/2024_

Raymond Mada

KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(971) 634-1132 · FAX (503) 222-5290

**CERTIFICATE OF SERVICE**

1

2        I certify that on this __19th__ day of December, 2024, the foregoing **DECLARATION OF**

3  **WELLS FARGO BANK, N.A. IN SUPPORT OF MOTION FOR RELIEF FOR WELLS**

4  **FARGO BANK, N.A.** will be served in accordance with the Court's CM/ECF system which

5  will send notification of such filing by notice via email to the ECF participants of record a true

6

7  copy of the foregoing document.

        I further certify that on this __19th__ day of December, 2024, the foregoing

8

9  **DECLARATION OF WELLS FARGO BANK, N.A. IN SUPPORT OF MOTION FOR**

10  **RELIEF FOR WELLS FARGO BANK, N.A.** was served on the following by mailing by

11  depositing with the U.S. mail in Portland, Oregon, enclosed in a sealed envelope with first class

12  postage prepaid. Addressed as follows:

13        Michael Lenning
          14411 Railroad Circle NE

14        Duvall, WA 98019

15

16             KILMER, VOORHEES & LAURICK, P.C.

17

18        */s/ James P. Laurick*
          James P. Laurick, WSBA #33320

19        2701 NW Vaughn Street, Suite 780
          Portland, Oregon 97210

20        Phone No.: 971-634-1132
          Fax No.: 503-222-5290

21        Of Attorneys for Creditor Wells Fargo Bank, N.A.
          M:\10004\0204\Pleadings - Michael Lenning bk\Client Decl ISO Motion for Relief.doc

22

23

24

25

26

**CERTIFICATE OF SERVICE- 1**



Wells Fargo Practice Finance, a division of Wells Fargo Bank, N.A.
2001 Clayton RD, STE 900
Concord, CA 94520
Phone: (800) 326-0376
Fax: (800) 318-8601



## Master Loan and Security Agreement

Master Loan and Security Agreement dated as of ___April 13, 2022___

**Name and Address of Borrower:**
Novel Eyes PLLC
15 SW Everett Mall Way Ste J
Everett, Washington 98204-2715

### Master Loan and Security Agreement Provisions

**1. INTRODUCTION.** In consideration of the mutual covenants set forth herein, Borrower and Lender hereby enter into this Master Loan and Security Agreement and agree to the terms and conditions set forth herein. Each Loan Schedule that may be executed by Borrower and Lender from time to time pursuant to this Master Loan and Security Agreement shall be deemed to be a separate loan transaction incorporating all of the terms and conditions of this Master Loan and Security Agreement. References in this Master Loan and Security Agreement to "Agreement", "hereunder" and "herein" shall mean a Loan Schedule which incorporates this Master Loan and Security Agreement. References in this Master Loan and Security Agreement to "Loan" shall mean the loan transaction evidenced by a Loan Schedule. **Borrower represents and warrants to Lender that it will use the proceeds of each Loan entered into hereunder exclusively for business purposes, and not for any other purpose.**

**2. LOAN SCHEDULES.** Borrower shall evidence its agreement to enter into a loan transaction incorporating the terms hereof by executing and delivering to Lender a Loan Schedule. Borrower's execution of a Loan Schedule shall obligate Borrower to make all of the payments set forth in the Loan Schedule. The Loan Schedule shall set forth the amount of the Loan, the term of the Loan, the number of payments to be made and the amount and dates upon which such payments are due (each a "Payment Date"). Lender shall have no obligation to enter into or accept any Loan Schedule and no Loan Schedule shall be binding upon Lender until accepted by Lender which acceptance shall be evidenced only by the execution of such Loan Schedule by Lender.

**3. SECURITY INTEREST.** To secure the payment and performance of (a) all present and future Indebtedness of Borrower to Lender; (b) all obligations of Borrower and rights of Lender under this Agreement; and (c) all present and future obligations of Borrower to Lender of other kinds (all such debts, liabilities and obligations being herein collectively referred to as the "Obligations"), Borrower hereby grants to Lender a security interest in all of the property described in a Loan Schedule, together with all substitutions, replacements, parts, accessories, supplies, improvements, additions and accessions now or hereafter affixed thereto or used in connection therewith, and all proceeds and products thereof (referred to collectively as the "Collateral" and individually as an "Item"). The word "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrower heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable. Unless specifically released by Lender, each Item shall secure Borrower's obligations under each and every Loan Schedule.

**4. COLLATERAL COVENANTS.** (a) Affirmative Covenants. Borrower shall: (i) have, at the time Borrower acquires rights in the Collateral, absolute title to each Item of Collateral free and clear of all security interests, liens and encumbrances except the security interest of Lender and will defend the Collateral against all claims or demands of all persons other than Lender; (ii) use the Collateral primarily for business purposes as opposed to personal, family or household purposes; (iii) pay all shipping and delivery charges and other expenses incurred in connection with the Collateral and pay all lawful claims, whether for labor, materials, supplies, rent, taxes or services, which might or could if unpaid become a lien on the Collateral; (iv) comply with all laws and regulations and rules, all manufacturer's instructions and warranty requirements, and the conditions and requirements of all policies of insurance relating to the Collateral and its use; (v) mark and identify the Collateral with all information and in such manner as Lender may request from time to time and replace promptly any such markings or identification which are removed, defaced or destroyed; (vi) at any and all times during business hours, grant Lender free access to enter upon the premises wherein the Collateral shall be located or used and permit Lender to inspect the Collateral; and (vii) pay when due or reimburse Lender on demand for all costs of collection of any of the Obligations and all other out-of-pocket expenses (including in each case all reasonable attorneys' fees) incurred by Lender in connection with the creation, continuance, perfection, satisfaction, protection, defense or enforcement of Lender's security interest in the Collateral or the creation, continuance, protection, defense or enforcement of this Agreement or any or all of the Obligations, including expenses incurred in any litigation or bankruptcy or insolvency proceedings.

(b) Negative Covenants. Borrower shall not (i) voluntarily or involuntarily create, incur, assume or suffer to exist any mortgage, lien, security interest, pledge or other encumbrance or attachment of any kind whatsoever upon, affecting or with respect to the Collateral or the Agreement or any of Borrower's interest under the Agreement; (ii) permit the name of any person, association or corporation other than Borrower or Lender to be placed on the Collateral as a designation that might be interpreted as a claim of ownership or security interest; (iii) part with possession or control of or suffer or allow to pass out of its possession or control any Item or change the location of the Collateral or any part thereof from the address shown on the Loan Schedule; (iv) ASSIGN OR IN ANY WAY DISPOSE OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THE AGREEMENT OR ENTER INTO ANY LEASE OF ALL OR ANY PART OF THE COLLATERAL, including, with respect to any of the foregoing actions described in this subclause (iv), pursuant to a Division (as defined below); (v) change its name or address from that set forth above unless it shall have given Lender no less than thirty (30) days' prior written notice thereof; (vi) permit the sale or transfer of any shares of its capital stock or of any ownership interest in the Borrower to any person, persons, entity or entities (whether in one single transaction or in multiple transactions) which results in a transfer of a majority interest in the ownership and/or the control of the Borrower from the person, persons, entity or entities who hold ownership or control of the Borrower as of the date of this Master Loan and Security Agreement; (vii) consolidate with or merge into or with any other entity, or purchase or otherwise acquire all or substantially all of the assets or stock or other ownership interest of any person or entity or sell, transfer, lease or otherwise dispose of all or substantially all of Borrower's assets to any person or entity, including, with respect to any of the foregoing actions described in this subclause (vii), pursuant to a Division (as defined below); or (viii) incur additional indebtedness relating to the Borrower's business (the "Practice") in excess of $25,000 in any calendar year without the express written consent of Lender. "Division" means a division or part of division under Delaware law, including a division pursuant to Section 18-217 of the Delaware Limited Liability Company Act (or any corresponding provision of any successor statute) and a division pursuant to Section 17-220 of the Delaware Revised Uniform Limited Partnership Act (or any corresponding provision of any successor statute), or any comparable event under a different state's laws, pursuant to which the assets, rights, liabilities and/or obligations of an entity are divided among two or more entities. For all purposes of the Agreement and this Master Loan and Security Agreement, if pursuant to a Division

1505AFS MASTER LOAN AND SECURITY AGREEMENT | November 2019
3037575

Page 1

Exhibit 1
Page 6 of 24

any asset, right, obligation or liability of any entity becomes the asset, right, obligation or liability of a different entity, then such asset, right, obligation or liability shall be deemed to have been transferred and assigned from the original entity to the subsequent entity on the date such Division becomes effective.

**5. PRACTICE COVENANTS.** (a) *Affirmative Covenants.* Borrower agrees that until all Obligations have been paid in full, Borrower will: (i) respond promptly (but in no event later than the second business day after) and completely to Lender's telephone and written inquiries regarding the status of the Practice and the financial condition of Borrower; (ii) do or cause to be done all things necessary to obtain, enter into, preserve and keep in full force and effect all material licenses and all material agreements relating to third party payor or reimbursement programs or plans; (iii) engage in the Practice on a full-time basis; (iv) observe all applicable legal requirements (including, without limitation, requirements with respect to drugs, medications, medical waste, and "controlled substances") relating to the Practice and perform the terms of all material agreements relating thereto; and (v) notify Lender immediately of any (1) notice, claim or demand from any federal, state or local governmental entity or any agency thereof which alleges that Borrower or any professional in the Practice is in violation of any of the terms of, or has failed to comply with, any requirement of law regulating the Practice or its operations; (2) actual, threatened or pending (A) revocation, suspension, probation, restriction, limitation, forfeiture or refusal to renew of any professional license of Borrower, or of any licensed professional who is an owner or shareholder, in whole or in part, of the Practice or (B) decertification, revocation, suspension, probation, restriction, limitation, forfeiture or refusal to renew any participation in Medicare or Medicaid and any third party payor program to the extent decertification, revocation, suspension, probation, restriction, limitation, forfeiture or refusal to renew any such other third party payor program could materially adversely affect the ability to repay the Indebtedness; and (3) other developments in the business or affairs of the Borrower which could adversely affect the ability of Borrower to repay the Indebtedness or comply with the provisions of this Agreement or any Loan Schedule.

(b) *Negative Covenants.* Borrower agrees that until all Obligations have been paid in full, Borrower will not allow or suffer: (i) any breach, rating reduction, restriction, suspension, probation, failure to renew, cancellation, rescission, termination, lapse or forfeiture of any material license for Borrower or for any professional now or hereafter employed by or practicing with Borrower or of any material third party payor participation or reimbursement agreements now or at any time hereafter existing for the benefit of Borrower or the Practice relating to rights to payment or reimbursement from, and claims against, private insurers, managed care plans, employee assistance programs, federal, state or local governmental agencies, including without limitation, Medicare, Medicaid, and other third party payors; (ii) the dismissal, resignation or other withdrawal from the Practice of Borrower, or of any licensed professional who is an owner or shareholder, in whole or in part, of the Practice; or (iii) the suspension of the Practice for more than thirty (30) days. In addition to the foregoing, Borrower agrees that until all Obligations have been paid in full, Borrower shall not, directly or indirectly (i) hire or induce any party to recruit or hire any person who is an employee or independent contractor of the Practice; (ii) whether for itself or any other person or entity, call upon, solicit, divert or take away any customers, business or clients of the Practice (including, without limitation, any third party payors); (ii) solicit or induce any party to solicit, any contractors of the Practice to enter into the same or a similar type of contract with any other party; or (iv) disrupt, damage, impair or interfere with the business of the Practice.

**6. BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower hereby represents, warrants and agrees as follows: (a) Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, is duly qualified and in good standing to conduct business in all jurisdictions in which any Item may be located and has the power and authority to carry on its business as presently conducted and to enter into and perform its obligations under this Agreement and the Loan Schedules; (b) this Agreement and each Loan Schedule have been duly authorized by Borrower and upon execution by Borrower shall constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their terms; (c) the financial and other information which Borrower has submitted, or will submit, to Lender in connection with this Agreement is, or shall be at time of submission, true and complete; (d) since the date of the most recent of such financial statements and information, there has not been any material adverse change in the business, financial, or other condition of, or the prospects or projections of Borrower, the industry in which it operates, or the Collateral. Each person executing this Agreement or any Loan Schedule on Borrower's behalf warrants his/her due authority to do so.

**7. ASSIGNMENT.** Lender may sell or assign its interest in the Agreement or any Loan and assign its security interest in all or any part of the Collateral without notice to or the consent of Borrower. Borrower agrees not to assert against any assignee of Lender any claim or defense Borrower may have against Lender.

**8. COLLATERAL PERSONALTY.** The Collateral shall remain personal property regardless of its attachment to realty, and Borrower agrees to take such action at its expense as may be necessary to prevent any third party from acquiring any interest in the Collateral as a result of its attachment to realty. If requested by Lender with respect to any Item, Borrower will obtain and deliver to Lender waivers of interest or liens in recordable form, satisfactory to Lender, from all persons claiming any interest in the real property on which such Item is installed or located.

**9. USE AND MAINTENANCE.** Borrower will use the Collateral with due care and for the purpose for which it is intended. Borrower will maintain the Collateral in good repair, condition and working order and will furnish all parts and services required therefor, all at its expense, ordinary wear and tear excepted. Borrower shall, at its expense, make all modifications and improvements to the Collateral required by law, and shall not make other material modifications or improvements to the Collateral without the prior written consent of Lender. All parts, modifications and improvements to the Collateral shall, when installed or made, immediately become part of the Collateral for all purposes and subject to Lender's security interest under the Agreement.

**10. LOSS OR DAMAGE.** No loss or damage to the Collateral or any part thereof shall affect any obligation of Borrower under the Agreement, which shall continue in full force and effect. Borrower shall advise Lender promptly in writing of any Item lost or damaged and of the circumstances and extent of such damage. If any Item shall be lost, stolen, damaged beyond repair or permanently rendered unfit for use for any reason (an "Event of Loss"), Borrower shall, within 10 days, give written notice to Lender of the Event of Loss and the facts pertaining thereto. Borrower shall, at Lender's option, either (a) replace such Item with collateral acceptable to Lender within 30 days after the Event of Loss and such replacement collateral shall automatically become Collateral subject to Lender's security interest under the Agreement or (b) on the first Payment Date at least 20 days after the Event of Loss pay Lender an amount equal to the outstanding principal balance with respect to the applicable Loan, plus accrued but unpaid interest, late charges and all other amounts due but unpaid hereunder. The payment received by Lender will be applied to Borrower's obligations under the Loan Schedule, whether or not matured, in any order, at Lender's option. Any insurance or condemnation proceeds received shall be paid to Lender and credited to Borrower's obligation under this paragraph. Whenever the Collateral is damaged and such damage can be repaired, Borrower shall, at its expense, promptly effect such repairs and to the extent Lender shall deem necessary for compliance with paragraph 9 above. Proceeds of insurance shall be paid to Lender with respect to such reparable damage to the Collateral and shall, at the election of Lender, be applied either to the repair of the Collateral by payment by Lender directly to the party completing the repairs, or to the reimbursement of Borrower for the cost of such repairs; provided, however, that Lender shall have no obligation to make such payment or any part thereof until receipt of such evidence as Lender shall deem satisfactory that such repairs have been completed and further provided that Lender may apply such proceeds to the payment of any installment or other sum due or to become due under the Agreement if at the time such proceeds are received by Lender there shall have occurred any Event of Default or any event which with lapse of time or notice, or both, would become an Event of Default.

**11. INSURANCE.** Borrower shall obtain and maintain at its own expense (i) physical damage insurance insuring against loss or damage to the Collateral in an amount not less than the full replacement value of the Collateral and naming Lender as loss payee (ii) general liability, property damage and malpractice insurance in an amount satisfactory to Lender and naming Lender as an additional insured, and (iii) workers' compensation insurance for all employees of Borrower in such amount as is required by applicable law. Borrower shall furnish Lender with a certificate of insurance evidencing the issuance of such policies to Borrower in at least the minimum amount

required herein. Each policy shall be in such form and with such insurers as may be satisfactory to Lender, and shall contain a clause requiring the insurer to give to Lender at least 30 days prior written notice of any alteration in the terms of such policy or the cancellation thereof, and a clause specifying that no action or misrepresentation by Borrower shall invalidate such policy. Lender shall be under no duty to ascertain the existence of or to examine any such policy or to advise Borrower in the event any such policy shall not comply with the requirements hereof.

**12. ADDITIONAL ACTION.** Borrower will promptly execute and deliver to Lender such further documents and take such further action as Lender may request in order to carry out more effectively the intent and purpose of the Agreement, including any action deemed necessary to protect fully Lender's interest under the Agreement in accordance with the Uniform Commercial Code or other applicable law. Lender and any assignee of Lender is authorized to file one or more Uniform Commercial Code financing statements without the signature of Borrower or signed by Lender or any assignee of Lender as attorney-in-fact for Borrower. Borrower agrees to furnish promptly to Lender (a) tax returns and financial statements (b) any other information Borrower ordinarily provides to the public, and (c) such other information and documents not specifically mentioned herein relating to the Agreement or a Loan Schedule, as Lender may request from time to time. Borrower hereby grants to Lender a power of attorney in Borrower's name, to apply for a certificate of title for any item that is required to be titled under the laws of any jurisdiction where the Collateral is or may be used and/or to transfer title thereto upon the exercise by Lender of its remedies upon an Event of Default by Borrower under the Agreement. Borrower will pay all costs of filing any financing, continuation or termination statements with respect to the Agreement including, without limitation, any documentary stamp taxes relating thereto. Borrower will do whatever may be necessary to have a statement of the interest of Lender and any assignee of Lender in the Collateral noted on any certificate of title relating to the Collateral and will deliver said certificate to Lender. If Borrower fails to perform or comply with any of its agreements, Lender may perform or comply with such agreements in its own name or in Borrower's name as attorney-in-fact and the amount of any payments and expenses of Lender incurred in connection with such performance or compliance, together with interest thereon at the rate provided below, shall be deemed payable by Borrower upon demand.

**13. HIPAA BUSINESS ASSOCIATE AGREEMENT.** For purposes of this paragraph 13: (i) the term "HIPAA Rules" means the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164, and (ii) other capitalized terms not otherwise defined in this Agreement or this paragraph will have the meanings given to them in the HIPAA Rules. The terms of this paragraph 13 only apply to this Agreement if both: (i) Lender is a Covered Entity, and (ii) Lender receives or has access to Protected Health Information ("PHI") from the Borrower. A reference in this Agreement to a section in the HIPAA Rules means the section as in effect or as amended. Lender may only Use or Disclose PHI as necessary to carry out the terms of the Agreement, which includes the right by the Lender to Use or Disclose PHI as necessary for Lender to either administer, service, or monitor the Loan, or to enforce the Lender's rights and remedies under the Agreement, including the enforcement of Lender's rights in, and the disposition of, the Collateral. Lender may Use or Disclose PHI as Required by Law. Lender may Use PHI for the proper management and administration of the Lender or to carry out the legal responsibilities of the Lender. To the fullest extent permitted by law, Borrower represents and warrants that Borrower has not, and during the term of the Agreement Borrower will not, agree to any restriction on the Use or Disclosure of PHI by an individual, or include any limitation in the Borrower's notice of privacy practices, if either such a restriction or a limitation would limit the ability of the Lender to carry out Lender's rights under the Agreement to Use or Disclose PHI in the manner permitted by the Lender under this paragraph 13. Without limiting the applicability of the foregoing, Borrower will notify Lender of any: (i) limitation(s) in the Borrower's notice of privacy practices, to the extent that such limitation may affect Lender's Use or Disclosure of PHI, and (ii) restriction on the Use or Disclosure of PHI that Borrower has agreed to or is required to abide by under 45 CFR 164.522, to the extent that such restriction may affect Lender's Use or Disclosure of PHI. Borrower will notify Lender of any changes in, or revocation of, the permission by an individual to Use or Disclose his or her PHI if such changes may affect Lender's Use or Disclosure of PHI. Lender may not Use or Disclose PHI in a manner that would violate the HIPAA Rules if done by Borrower except for the specific Uses and Disclosures otherwise authorized under this paragraph 13. Lender will not Use or Disclose PHI other than as permitted or required by the Agreement or as Required by Law. Lender will use appropriate safeguards, and comply with the HIPAA Rules with respect to Electronic Protected Health Information, to prevent the Use or Disclosure of PHI other than as provided for by the Agreement. Lender will report to Borrower any Use or Disclosure of PHI not provided for by the Agreement of which Lender becomes aware, including Breaches of Unsecured Protected Health Information as required by the HIPAA Rules, and any Security Incident of which Lender becomes aware. Lender will ensure that any subcontractors that create, receive, maintain, or transmit PHI on behalf of the Lender will agree to the same restrictions, conditions, and requirements that apply to Lender with respect to such information. Lender will make available PHI in a Designated Record Set to the Borrower as necessary to satisfy Borrower's obligations under 45 CFR 164.524. Lender will make any amendment(s) to PHI in a Designated Record Set as determined by Borrower under 45 CFR 164.526. Lender will maintain and make available the information required to provide an accounting of disclosures to the Borrower as necessary to satisfy Borrower's obligations under 45 CFR 164.528. If Lender will carry out one or more of Borrower's obligation(s) under Subpart E of 45 CFR Part 164, Lender will comply with the requirements of Subpart E that apply to the Borrower in the performance of such obligation(s). Lender will make Lender's internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules. Borrower and Lender agree that termination of the terms of this paragraph 13 is generally infeasible while the Agreement is in effect and will work together to prevent any such termination. Borrower may terminate the terms of this paragraph 13 only if Borrower determines Lender has violated a material term of this paragraph 13, and the Lender has not cured or ended the violation within 60 days written notice of the breach or violation by the Borrower. Provided, however, that if Lender determines that Borrower's termination was unreasonable or unjustified under the circumstances, then (i) any such termination by the Borrower will be considered to constitute an additional "Event of Default" by the Borrower under this Agreement (regardless of whether such termination is separately enumerated as an "Event of Default" within the paragraph of this Agreement enumerating such events), and will give rise to Lender's remedies under the Agreement, and (ii) Borrower will cooperate with Lender to enter into subsequent agreements or arrangements with Lender or another third party that permit Lender to exercise Lender's rights under this Agreement, including the exercise of Lender's rights in the Collateral, in a manner that is consistent with the intended remedies in the Agreement and the HIPAA Rules. Upon termination of the Agreement or this paragraph 13, Lender will either return or destroy all PHI received from Borrower, or created or received by the Lender, or if such return or destruction is infeasible, Lender will extend the protections of this paragraph 13 to the PHI and limit further Uses and Disclosures to those purposes specified in this paragraph 13 that survive the termination of the Agreement or this paragraph 13, or to those purposes that make the return or destruction of the PHI infeasible. The terms of this paragraph 13 will survive the termination of the Agreement as long as Lender has any access to PHI. Nothing in this paragraph 13 is intended or shall be construed so as to confer any right or remedy on any third party.

**14. LATE CHARGES.** In the event any amount payable under the Agreement shall not be paid when due, Lender shall have the right to assess and Borrower shall pay to Lender, as a late charge, 10% of such overdue amount or the maximum late charge allowed by law, whichever is less. Payments thereafter received shall be applied first to delinquent installments and then to current installments.

**15. DEFAULT.** Each of the following events shall constitute an "Event of Default" under the Agreement: (a) Borrower shall fail to make any required payment when due under the Agreement; (b) any certificate, statement, representation, warranty or financial or credit information heretofore or hereafter made or furnished by or on behalf of Borrower or any guarantor of any of Borrower's obligations under the Agreement proves to have been false or misleading in any material respect or omitted any material fact, contingent or unliquidated liability or claim against Borrower or any such guarantor; (c) Borrower shall fail to observe or perform any other agreement to be observed or performed by Borrower under the Agreement and the continuance thereof for 10 calendar days following written notice thereof by Lender to Borrower; (d) Borrower or any guarantor of Borrower's obligations under the Agreement or any partner of Borrower if Borrower is a partnership shall cease doing business as a going concern or make an assignment for the benefit of creditors; (e) Borrower or any guarantor of Borrower's obligations under the Agreement or any partner of Borrower if Borrower is a partnership shall voluntarily file, or have filed against it involuntarily, a petition for liquidation, reorganization, adjustment of debt, or similar relief under the federal Bankruptcy Code or any other present or future federal or state bankruptcy or insolvency law, or a trustee, receiver, or liquidator shall be appointed of it or of all or a substantial part of its assets; (f) Borrower or any guarantor of any of Borrower's obligations

Exhibit 1
Page 3 of 17

under the Agreement shall be in breach of or in default in the payment or performance of any obligation owing to any bank, lender, lessor or financial institution, howsoever arising; (g) any individual Borrower, guarantor of Borrower's obligations under the Agreement, or partner of Borrower if Borrower is a partnership shall die; (h) Borrower or any guarantor of Borrower's obligations under the Agreement revokes or disputes the validity of any of the, his or its liabilities or obligations under the Agreement, this Master Loan and Security Agreement, any guaranty or any other document entered into by Borrower or such guarantor in connection with the Loan or the Agreement; (i) an event of default shall occur under any other obligation Borrower owes to Lender; (j) an event of default shall occur under any indebtedness Borrower may now or hereafter owe to any affiliate of Lender; or (k) Borrower shall suffer an adverse material change in its financial condition from the date hereof, and as a result thereof Lender deems itself of any of the Collateral to be insecure.

**16. REMEDIES.** At any time after the occurrence of an Event of Default, Lender shall have the remedies of a secured party under the Uniform Commercial Code and Lender shall also exercise one or more of the following remedies:

(a) Lender may declare all unmatured obligations, including but not limited to, all unpaid amounts under the Agreement and under each and every other Loan Schedule to this Master Agreement to be immediately due and payable and thereupon Borrower shall pay to Lender an amount equal to the sum of (i) all obligations that were due and unpaid by Borrower to Lender prior to the time of such declaration (ii) the unpaid principal balance of each Loan Schedule and (ii) all accrued and unpaid interest, late charges, fees and expenses due to Lender under each Loan Schedule (collectively, the "Accelerated Balance") (the date such amounts are declared due, the "Declaration Date"). Interest on the Accelerated Balance shall be calculated from the date of such Event of Default, both before and after judgment, at the rate of the lesser of 12% per annum or the highest rate permitted by law (the "Default Rate").

(b) Lender may require Borrower, at Lender's request and at Borrower's own cost, to promptly deliver possession of the Collateral to Lender in such manner and to such place as Lender shall direct, or Lender may at any hour, without notice to Borrower and without liability except for malicious acts by its agents, enter upon Borrower's premises or any other premises and take possession of or render unusable any item and attachments thereof, whether or not part of the Collateral, and hold, lease or sell at public or private sale any such item and attachments. If Lender leases or sells the Collateral, Lender shall have the right to recover from Borrower any deficiency remaining after the application of the proceeds to the Accelerated Balance and all other amounts due under the Agreement. At any such sale, Lender may disclaim any warranties of title or the like. If Lender sells any of the Collateral upon credit, Borrower will be credited only with the payments actually made by the purchaser. Borrower shall cooperate in connection with any such sale, and upon the request of Lender, shall take all action reasonably required to allow such sale to take place at the existing location of the Collateral or any part thereof.

(c) In addition to any amounts recoverable under this paragraph 15, Lender shall be entitled to recover all expenses and collection costs which Lender shall have incurred by reason of any Event of Default, including but not limited to expenses of repossession, repair, storage, transportation, and disposition of the Collateral and including expenses incurred by employees and reasonable attorneys' fees, including attorneys' fees on appeal or in connection with any bankruptcy proceeding.

(d) Lender's remedies shall be cumulative and shall be in addition to all other remedies at law or in equity or by agreement, but only to the extent necessary to permit Lender to recover amounts for which Borrower is liable under the Agreement. Borrower waives any requirements of law that might limit any of the remedies herein to the extent permitted by law. To the extent permitted by applicable law, Borrower hereby waives the benefit and advantage of, and covenants not to assert against Lender, any valuation, inquisition, stay, appraisement, extension or redemption laws now existing or which may hereafter exist which, but for this provision, might be applicable to any sale or lease made under the judgment, order or decree of any court or under the powers of sale and leasing conferred by the Agreement or otherwise. To the extent permitted by applicable law, Borrower hereby waives any rights now or hereafter conferred by statute or otherwise which may require Lender to sell, lease or otherwise use any Collateral in mitigation of Lender's damages or require Lender to proceed against any person or to exhaust any Collateral or to pursue any remedy in Lender's power.

**17. NOTICES.** Any written notice under the Agreement to Borrower or Lender shall be deemed to have been given when delivered personally or deposited with a recognized overnight courier service or in the United States mails, postage prepaid, addressed to recipient at its address set forth above or at such other address as may be last known to the sender.

**18. COUNTERPARTS.** Lender may in its sole discretion, accept a photocopy, electronically transmitted facsimile or other reproduction of this Agreement and/or a Loan Schedule (a "Counterpart") as the binding and effective record of this Agreement and/or a Loan Schedule whether or not an ink signed copy hereof or thereof is also received by Lender from Borrower, provided, however, that if Lender accepts a Counterpart as the binding and effective record of this Agreement or a Loan Schedule, the Counterpart acknowledged in writing by Lender shall constitute the record hereof or thereof. Borrower agrees that a Counterpart of this Agreement or a Loan Schedule received by the Lender, shall, when acknowledged in writing by Lender, constitute an original document for the purposes of establishing the provisions hereof and thereof and shall be legally admissible under the best evidence rule and binding on and enforceable against Borrower. If Lender accepts a Counterpart of a Loan Schedule as the binding and effective record thereof only such Counterpart acknowledged in writing by Lender shall be marked "Original" and to the extent that a Loan Schedule constitutes chattel paper, a security interest may only be created in the Loan Schedule that bears Lender's ink signed acknowledgment and is marked "Original."

**19. NON-WAIVER.** No course of dealing between Lender and Borrower or any delay or omission on the part of Lender in exercising any rights under the Agreement shall operate as a waiver of any rights of Lender. A waiver as any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. No waiver or consent shall be binding upon Lender unless it is in writing and signed by Lender.

**20. MISCELLANEOUS.** This Agreement can be waived, modified, amended, terminated or discharged, and the Security Interest can be released, only explicitly in a writing signed by Lender. Lender's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if Lender exercises reasonable care in physically safekeeping such Collateral or, in the case of Collateral in the custody or possession of a bailee or other third person, exercises reasonable care in the selection of the bailee or other third person, and Lender need not otherwise preserve, protect, insure or care for any Collateral. Lender shall not be obligated to reserve any rights Borrower may have against prior parties, to realize on the Collateral at all or in any particular manner or order, or to apply any cash proceeds of Collateral in any particular order of application. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, representatives and assigns and shall take effect when signed by Borrower and delivered to Lender, and Borrower waives notice of Lender's acceptance hereof. Lender may execute this Agreement if appropriate for the purpose of filing, but the failure of Lender to execute this Agreement shall not affect or impair the validity or effectiveness of this Agreement. A carbon, photographic or other reproduction of this Agreement or any other financing statement signed by the Borrower shall have the same force and effects as the original for all purposes of a financing statement. If any provision or application of this Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect, and this Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby. All representations and warranties contained in this Agreement shall survive the execution, delivery and performance of this Agreement and the creation and payment of the Obligations. If this Agreement is signed by more than one person as Borrower, the term "Borrower" shall refer to each of them separately and to both or all of them jointly; all such persons shall be bound both severally and jointly with the other(s); and the Obligations shall include all debts, liabilities and obligations owed to Lender (by any Borrower solely or by both or several or all Borrowers jointly or jointly and severally, and all property described in paragraph 3 shall be included as part of the Collateral, whether it is owned jointly by both or all Borrowers or is owned in whole or in part by one (or more) of them. This Master Loan and Security Agreement and each Loan Schedule constitute the entire agreement of the parties with respect to the subject matter hereof. TIME IS OF THE ESSENCE WITH RESPECT TO THE OBLIGATIONS OF BORROWER UNDER THIS AGREEMENT.

**21. VENUE; CHOICE OF LAW.** This Master Loan and Security Agreement and each Loan Schedule shall be deemed to have been entered into at the offices of the Lender in Alameda County, California, where this Agreement and each Loan Schedule are being signed on behalf of Lender, and all performance on the part of Borrower shall be deemed to have been required to be performed by Borrower at said offices of Lender. Jurisdiction and venue in any action or proceeding concerning this Agreement or any Loan Schedule shall be in the proper state or federal court located in Alameda County, California, or in any appropriate court in another jurisdiction selected by Lender, which has jurisdiction over the parties and Borrower unconditionally submits to such jurisdiction and venue. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California.

**22. ARBITRATION – BINDING ARBITRATION.** Lender and each party to this agreement hereby agree, upon demand by any party, to submit any Dispute to binding arbitration in accordance with the terms of this Arbitration Program. Arbitration may be demanded before the institution of a judicial proceeding, or during a judicial proceeding, but not more than 60 days after service of a complaint, third party complaint, cross-claim, or any answer thereto, or any amendment to any of such pleadings. A "Dispute" shall include any dispute, claim or controversy of any kind, whether in contract or in tort, legal or equitable, now existing or hereafter arising, relating in any way to any aspect of this agreement, or any related note, instrument or agreement incorporating this Arbitration Program (the "Documents"), or any renewal, extension, modification or refinancing of any indebtedness or obligation relating thereto, including without limitation, their negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination, or any request for additional credit. This provision is a material inducement for the parties entering into the transactions relating to this Agreement. In the event of a court ordered arbitration, the party requesting arbitration shall be responsible for timely filing the demand for arbitration and paying the appropriate filing fee within 30 days of the abatement order or the time specified by the court; the party's failure to do so shall result in that party's right to demand arbitration being automatically terminated with respect to such Dispute. DISPUTES SUBMITTED TO ARBITRATION ARE NOT RESOLVED IN COURT BY A JUDGE OR JURY. TO THE EXTENT ALLOWED BY APPLICABLE LAW, THE PARTIES IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY DISPUTE ARBITRATED PURSUANT TO THIS ARBITRATION PROGRAM.

**A. Governing Rules.** Any arbitration proceeding will (i) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (ii) be conducted by the American Arbitration Association ("AAA"), or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs, in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes are referred to herein, as applicable, as the "Rules"). If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control. Arbitration proceedings hereunder shall be conducted at a location mutually agreeable to the parties, or if they cannot agree, then at a location selected by the AAA in the state of the applicable substantive law primarily governing the Note. Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any Dispute. The arbitrator shall award all costs and expenses of the arbitration proceeding.

**B. No Waiver of Provisional Remedies, Self-Help and Foreclosure.** The arbitration requirement does not limit the right of any party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any party to submit any Dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in sections (i), (ii) and (iii) of this paragraph.

**C. Arbitrator Qualifications and Powers.** Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00. Any Dispute in which the amount in controversy exceeds $5,000,000.00 shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. Every arbitrator shall be a neutral practicing attorney or a retired member of the state or federal judiciary, in either case with a minimum of ten years' experience in the substantive law applicable to the subject matter of the Dispute. The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all Disputes in accordance with the applicable substantive law and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the applicable state rules of civil procedure, or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

**D. Discovery.** In any arbitration proceeding discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the Dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

**E. Class Proceedings and Consolidations.** No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

**F. Small Claims Court.** Any party may require that a Dispute be resolved in Small Claims Court if the Dispute and related claims are fully within that court's jurisdiction.

**G. Miscellaneous.** To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the Dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation. If more than one agreement for arbitration by or between the parties potentially applies to a Dispute, the arbitration provision most directly related to the documents between the parties or the subject matter of the Dispute shall control. This arbitration provision shall survive the repayment of the Note and the termination, amendment or expiration of any of the Documents or any relationship between the parties.

**23. MONEY LAUNDERING, SANCTIONS, CORRUPT PRACTICES, AND COMPLIANCE WITH ALL LAWS.** Borrower represents, warrants and agrees that Borrower (1) is not now and will not become the target of any trade or economic sanctions promulgated by the United Nations or the governments of the United States, the United Kingdom, the European Union, or any other jurisdiction in which Borrower is located or operates (collectively, "Sanctions"), (2) complies now and will at all times comply with the requirements of all laws, rules, regulations and orders of any jurisdiction in which Borrower is located or doing business, or otherwise is applicable to Borrower, including, without limitation, (a) all Sanctions, (b) all laws and regulations that relate to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto, (c) the U.S. Foreign Corrupt Practices Act of 1977, as amended, (d) the U.K. Bribery Act of 2010, as amended, and (e) any other anti-bribery or anti-corruption laws and regulations, and

1505APS MASTER LOAN AND SECURITY AGREEMENT | November 2019                                                                                              Page 5
3037575

(3) will not at any time directly or indirectly use any proceeds of any credit extended by Lender for the purpose of (a) providing financing or otherwise funding any targets of Sanctions; or (b) providing financing or otherwise funding any transaction which would be prohibited by Sanctions or would otherwise cause Lender or any of Lender's affiliates to be in breach of any Sanctions.

**LENDER:**
Wells Fargo Practice Finance, a division of Wells Fargo Bank, N.A.

By: *Sarah Vadi*

Title: BLA

**BORROWER:**
Novel Eyes PLLC

By: _____

Ariel Auerbach Lenning
Title: President

 **WELLS FARGO**

Wells Fargo Practice Finance, a division of Wells Fargo Bank, N.A.
2001 Clayton RD, STE 900
Concord, CA 94520
Phone: (800) 326-0376
Fax: (800) 318-8601



## Addendum No. 1

This Addendum No. 1 (the "Addendum") applies to that Master Loan and Security Agreement dated as of April 13, 2022 , (the "Contract"), between Wells Fargo Practice Finance, a division of Wells Fargo Bank, N.A., ("Lender") and Novel Eyes PLLC ("Borrower", which term includes any owner/shareholder/practitioner of Borrower). Capitalized terms not defined herein shall have the meanings defined in the Contract. In the event of any conflict between the provisions of this Addendum and provisions of the Contract or any other related documentation, the provisions of this Addendum shall prevail.

The specific items marked below are made a part of this Addendum and the Contract and are subject to all of the terms, covenants and conditions contained therein:

☒ Borrower shall, at its expense, maintain Disability Insurance providing for a monthly payment amount sufficient to pay the aggregate Monthly Payment due under all Loan Schedules entered into pursuant to the Contract.

☒ Borrower shall, at its expense, maintain Key-Person Life Insurance on any licensed professional who is an owner or shareholder, in whole or in part, of the Practice as reasonably required by Lender, in an amount sufficient to pay the aggregate payment obligation of Borrower for all Loan Schedules entered into pursuant to the Contract. Lender and its assignees will be named as collateral assignee.

☒ Borrower agrees to earn income from association with one or more unrelated practices until Borrower's business generates sufficient net income ("Net Income") to satisfy all (i) obligations of that business and (ii) reasonable personal obligations of Borrower. So long as any obligations of the Borrower to Lender remain unpaid and outstanding, Borrower further agrees to earn income from association with one or more unrelated practices should, at any time in the future, Net Income fail to satisfy clauses (i) and (ii) above.

☒ Borrower shall deliver to Lender a fully completed milestone report substantially in the form of Exhibit A attached hereto, or as otherwise determined by Lender on or before the 15th day of the month, following each quarterly period as required by Lender for a period of 12 months from the later of (i) the date of the first Schedule pursuant to the Contract or (ii) the commencement date of Borrower's business.

☐ Borrower agrees to maintain its operating account(s) with Wells Fargo or any banking affiliate of Wells Fargo for as long as any indebtedness is owed to Wells Fargo Bank, N.A. and its affiliates. Additionally, Borrower will offer Wells Fargo the opportunity to provide other business related banking products or services as required by the business.

☐ In addition to the remedies set forth in the Contract, upon the occurrence of any default by Borrower, Borrower agrees that (a) Lender shall be subrogated to all rights, but none of the obligations, of Borrower relating to or arising from the agreement (the "Buy-Sell Agreement") pursuant to which Borrower acquired from the seller (the "Seller") the practice located at ___ (the "Practice") and (b) The terms and conditions restricting competition by the Seller with the Practice, as set forth in the Buy-Sell Agreement or any other agreement between Borrower and Seller relating to the Practice, shall be applicable to the Borrower as well as the Seller.

☐ **Notice to and Consent by Florida Borrowers:** Borrower consents to the issuance of a continuing writ of garnishment or attachment against Borrower's disposable earnings in accordance with Section 222.11, Florida Statutes in order to satisfy in whole or in part, any money judgment entered in favor of Lender.

**LENDER**
Wells Fargo Practice Finance, a division of Wells Fargo Bank, N.A.

By: _Sarah Vadi_

Title: **BLA**

**BORROWER:**
Novel Eyes PLLC

By: _____
Ariel Auerbach Lenning
Title: **President**

1605 ADDENDUM NO 1AFS | February 2019
© 2019 Wells Fargo Bank, N.A. All Rights Reserved.



Wells Fargo Practice Finance, a division of Wells Fargo Bank, N.A.
2001 Clayton RD, STE 900
Concord, CA 94520
Phone: (800) 326-0376
Fax: (800) 318-8601



**★ D T P 2 8 0 9 5 ★**

**Post Booking Modification
Payment Schedule Notification
(MLSA)**

**Novel Eyes PLLC**
15 SW Everett Mall Way Ste J
Everett, WA 98204-2715

Obligor Number: ████9089-26

Reference is made to that certain Loan Schedule dated as of April 25th, 2022 to that certain Master Loan and Security Agreement dated as of April 13th, 2022 between Wells Fargo Practice Finance, a division of Wells Fargo Bank, N.A., as Lender, and Novel Eyes PLLC as Borrower, whether one or more, (the Master Loan and Security Agreement is herein referred to separately as the "Master Agreement" and together with each Loan Schedule thereunder as the "Agreement") and constitutes a separate loan (the "Loan") thereunder. All terms and conditions of the Agreement are incorporated herein and made a part hereof.

Pursuant to Section D of the above referenced Loan Schedule, Lender hereby notifies Borrower that effective as of the Commencement Date, all outstanding Advances have been converted to a Term Obligation. The monthly payments for this Loan Schedule shall be set forth as indicated below:

**PAYMENT SCHEDULE:**

| Principal amount of loan proceeds disbursed: | $467,884.05 | Capitalized Finance Charge included in Principle Amount: | $2,884.05 |
|---|---|---|---|
| Payment Period: | Monthly | Date of Conversion: | 10/01/2022 |
| Interest rate used in computing payment schedule | 4.00% | | |
| Drawdown Period Date: | Exact Date of Drawdown period: xx/xx/xxxx | First Payment Due Date | 11/01/2022 |
| Loan Period Date: | Only input date if maturity date is changing, if not-LEAVE BLANK | Remove unused balance to date: | $ |

| Number of installments | | Amount of each installment | Commencing on |
|---|---|---|---|
| 12 | Payments of | Interest Only | 11/1/2022 |
| 12 | Payments of | $3,174.29 | 11/1/2023 |
| 96 | Payments of | $5,463.58 | 11/1/2024 |

If you have any questions regarding your loan or need to do any account maintenance, please feel free to contact our National Business Banking Center at 800-225-5935.

Sincerely,

Janae Williams
Business Loan Administrator

225758
3037575

Exhibit 2
Page 1 of 2
Case 24-12533-CMA    Doc 12    Filed 12/19/24    Ent. 12/19/24 14:38:55    Pg. 13 of 24

Exhibit 2
Page 2 of 2

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Lien Solutions800-331-3282

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071
USA

Date of Filing : 10/28/2021
Time of Filing : 11:40:00 AM
File Number : 2021-301-3014-9
Lapse Date : 10/28/2026

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **NOVEL EYES PLLC** | | | | |
| 1b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 15 SW Everett Mall Way, Ste J | Everett | WA | 98204-2715 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Lenning | Ariel | | Auerbach | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 19225 Damson Rd, Unit Q1 | Lynnwood | WA | 98036-4957 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Wells Fargo Bank, N.A.** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2001 Clayton Road St 900 | Concord | CA | 94520 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

(a) (1) All Accounts, Chattel Paper, and other rights to payment of the Debtor, whether now owned or hereafter acquired; (2) all Inventory of the Debtor, whether now owned or hereafter acquired; (3) all Equipment of the Debtor, whether now owned or hereafter acquired; (4) all General Intangibles and Contract Rights of the Debtor including without limitation all patient records and patient charts, whether now owned or herafter acquired;
(b) All of the above, together with all substitutions and replacements for and products of any of the foregoing personal property, together with all accessions, attachments, parts, and

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
WA-0-83172642-62466536

Exhibit 3

# UCC FINANCING STATEMENT **ADDITIONAL PARTY**
FOLLOW INSTRUCTIONS

| 18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐ |
|---|

| 18a. ORGANIZATION'S NAME |
|---|
| **NOVEL EYES PLLC** |

OR

| 18b. INDIVIDUAL'S SURNAME |
|---|

| FIRST PERSONAL NAME |
|---|

| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|

**Date of Filing : 10/28/2021**
**Time of Filing : 11:40:00 AM**
**File Number : 2021-301-3014-9**
**Lapse Date : 10/28/2026**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| **THE OCULAR DOCTOR PLLC** |  |  |  |

OR

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **15 SW Everett Mall Way, Ste J** | **Everett** | **WA** | **98204-2715** | **USA** |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|

OR

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|

OR

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|

OR

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|

OR

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

24. MISCELLANEOUS:

4. This FINANCING STATEMENT covers the following collateral:

modifications, and repairs now or hereafter attached or affixed to or used in connection with any such personal property.
(c) Debtor has entered into an agreement between Debtor and Secured Party which contains a Negative Pledge Covenant prohibiting Debtor from incurring any additional indebtedness relating to the business in excess of $25,000.00 without the express written consent of Secured Party.

2021-301-3014-9

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)    8078 - WELLS FARGO

Lien Solutions                     83172642

P.O. Box 29071                     WAWA
Glendale, CA 91209-9071

File with: Department of Licensing, WA          THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| NOVEL EYES PLLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 15 SW Everett Mall Way, Ste J | Everett | WA | 98204-2715 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| Lenning | Ariel | Auerbach | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 19225 Damson Rd, Unit Q1 | Lynnwood | WA | 98036-4957 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Wells Fargo Bank, N.A. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2001 Clayton Road  St 900 | Concord | CA | 94520 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

(a) (1) All Accounts, Chattel Paper, and other rights to payment of the Debtor, whether now owned or hereafter acquired; (2) all Inventory of the Debtor, whether now owned or hereafter acquired; (3) all Equipment of the Debtor, whether now owned or hereafter acquired; (4) all General Intangibles and Contract Rights of the Debtor including without limitation all patient records and patient charts, whether now owned or herafter acquired;

(b) All of the above, together with all substitutions and replacements for and products of any of the foregoing personal property, together with all accessions, attachments, parts, and modifications, and repairs now or hereafter attached or affixed to or used in connection with any such personal property.

(c) Debtor has entered into an agreement between Debtor and Secured Party which contains a Negative Pledge Covenant prohibiting Debtor from incurring any additional indebtedness relating to the business in excess of $25,000.00 without the express written consent of Secured Party.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility      6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
83172642

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

Exhibit 4
Page 2 of 2

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor did not fit, check here ☐

9a. ORGANIZATION'S NAME

NOVEL EYES PLLC

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only <u>one</u> additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

THE OCULAR DOCTOR PLLC

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 15 SW Everett Mall Way, Ste J | Everett | WA | 98204-2715 | USA |

11. ☐ ADDITIONAL SECURED PARTY'S NAME    or    ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS: 83172642-WA-0   8078 - WELLS FARGO PRACTICE        Wells Fargo Bank, N.A.        File with: Department of Licensing, WA

**FILING OFFICE COPY —** UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282


Wells Fargo Practice Finance, a division of Wells Fargo Bank, N.A.
2001 Clayton RD, STE 900
Concord, CA 94520
Phone: (800) 326-0376
Fax: (800) 318-8601


* D T P 1 6 1 3 0 *

### Secured Guaranty

In consideration of any credit or other financial accommodation heretofore, now or hereafter extended or made to **Novel Eyes PLLC** ("Customer") by Wells Fargo Bank, N.A. (including its Wells Fargo Practice Finance division) ("Wells Fargo"), the undersigned unconditionally guarantees and promises to pay to Wells Fargo, its successors and assigns, on demand in lawful money of the United States of America and in immediately available funds, any and all Indebtedness of Customer to Wells Fargo. The term "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Customer, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement, and whether Customer may be liable individually or jointly with others, or whether recovery of any such Indebtedness may be or hereafter becomes enforceable. The undersigned agrees to pay to Wells Fargo all attorneys' fees and expenses incurred by Wells Fargo in collecting any or all of the Indebtedness or enforcing its rights against the undersigned under the terms of this Guaranty.

This Guaranty is a guaranty of prompt payment and performance (and not merely a guaranty of collection). Nothing herein shall require Wells Fargo to first seek or exhaust any remedy against the Customer, its successors and assigns, or any other person obligated with respect to the Indebtedness, or to first foreclose, exhaust or otherwise proceed against any leased or financed equipment, or any other collateral or security which may be given in connection with the Indebtedness. Suit may be brought and maintained against the undersigned without joinder of the Customer or any other person as parties thereto.

In order to secure the obligations of the undersigned pursuant to this Guaranty, the undersigned hereby grants to Wells Fargo a security interest in (capitalized terms used herein and not defined shall have the respective meanings as set forth in the Uniform Commercial Code): (1) All Accounts, Chattel Paper, and other rights to payment of the undersigned, whether now owned or hereafter acquired; (2) all Inventory of the undersigned, whether now owned or hereafter acquired; (3) all Equipment of the undersigned, whether now owned or hereafter acquired; and (4) all General Intangibles and Contract Rights of the undersigned including without limitation all patient records and patient charts, whether now owned or hereafter acquired; all of the above, together with all substitutions and replacements for and products of any of the foregoing personal property, together with all accessions, attachments, parts, and modifications, and repairs now or hereafter attached or affixed to or used in connection with any such personal property.

The undersigned waives any claim or other right which the undersigned might now have or hereafter acquire against the Customer or any person that is primarily or contingently liable on the Indebtedness or that arises from the existence or performance of the undersigned's obligations under this Guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim or remedy of Wells Fargo against the Customer or any collateral security therefor which Wells Fargo now has or hereafter acquires, whether or not such claim, remedy, or right arises in equity, or under contract, statute, or common law.

The undersigned waives notice of acceptance hereof and all other notices or demands of any kind to which it may be entitled and consents that Wells Fargo may, without affecting the undersigned's liability under this Guaranty, (i) compromise or release, on terms satisfactory to it or by operation of law or otherwise, any rights against Customer and other obligors and guarantors; (ii) grant extensions of time of payment to Customer or otherwise modify the Indebtedness; and (iii) consent to the transfer, sale or any other disposition of any leased or financed equipment, or any other collateral or security given in connection with the Indebtedness. If any amount paid at any time on account of any of the Indebtedness is required to be restored or returned to Wells Fargo as a result of any bankruptcy, insolvency or reorganization of Customer, the undersigned shall be liable under this Guaranty with respect to such amount as if such amount had never been paid.

Upon any default by the Customer in the payment and performance of its obligations under the Indebtedness, the liabilities and obligations of the undersigned hereunder shall, at the option of Wells Fargo, become forthwith due and payable to Wells Fargo without demand or notice of any nature, all of which are expressly waived by the undersigned.

This is a continuing Guaranty and shall not be discharged or affected by death of the undersigned, shall bind the heirs, administrators, representatives, successors and assigns of the undersigned, and may be enforced by or for the benefit of, any assignee or successor of Wells Fargo to the same extent Wells Fargo may, itself, enforce it.

The liability of the undersigned hereunder is primary and unconditional. If there is more than one undersigned, then the liability of each of the undersigned hereunder shall be joint and several. This Guaranty may be terminated by the undersigned upon 60-days prior written notice to Wells Fargo; provided, however, that said termination shall be effective only as to Indebtedness arising out of documentation executed by the Customer after the effective date of termination (the "Termination Date") and shall not affect Wells Fargo's rights under this Guaranty with respect to Indebtedness arising out of documentation executed by the Customer prior to the Termination Date (including subsequent fundings under a commitment (conditional or unconditional) that Wells Fargo issued before the Termination Date). If any Indebtedness arising out of documentation executed by the Customer prior to the Termination Date is renewed, extended or modified, with or without adjustment of interest rate or other terms, then such renewed, extended or modified Indebtedness shall be deemed to arise out of documentation executed by the Customer prior to the Termination Date, regardless of when such renewal, extension or modification occurred. The right of termination set forth in this paragraph is hereinafter referred to as the "Limited Guarantor Termination Right".

The undersigned assumes full responsibility for keeping fully informed of the financial condition of Customer and all other circumstances affecting Customer's ability to perform the Indebtedness, and agrees that Wells Fargo will have no duty to report to the undersigned any information that Wells Fargo receives about Customer's financial condition or any circumstances bearing on Customer's ability to perform under the Indebtedness.

If the Indebtedness includes a revolving credit feature, the undersigned acknowledges and agrees that the amount of the Indebtedness may fluctuate and that no reduction in such amount (even to zero) shall terminate this Guaranty or otherwise affect or reduce the liability of the undersigned hereunder.

If any of the undersigned is an entity, said undersigned entity represents, warrants and covenants to Wells Fargo that it has not and will not, without the prior written consent of Wells Fargo, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of its assets, including pursuant to a Division, except any of the foregoing in favor of Wells Fargo. As used in this Guaranty, a "Division" means a division or plan of division under Delaware law, including a division pursuant to Section 18-217 of the Delaware Limited Liability Company Act (or any corresponding provision of any successor statute) and a division pursuant to Section 17-220 of the Delaware Revised Uniform Limited Partnership Act (or any corresponding provision of any successor statute), or any comparable event under a different state's laws, pursuant to which the assets, rights, liabilities and/or obligations of an entity are divided among two or more entities. For all purposes of this Guaranty, if pursuant to a Division any asset, right, obligation or liability of any entity

becomes the asset, right, obligation or liability of a different entity, then such asset, right, obligation or liability shall be deemed to have been transferred and assigned from the original entity to the subsequent entity on the date such Division becomes effective.

The rights and obligations of the parties hereto shall be governed, construed and interpreted according to the laws of the State of California.

The undersigned hereby unconditionally and irrevocably submits to the jurisdiction of any state or federal court in the State of California in any action or proceeding brought to enforce this Guaranty and agrees that the proper venue for any legal action or judicial proceedings under or pursuant to this Guaranty shall be the County of Alameda, State of California.

This writing is intended by the parties as a final expression of their agreement and is also intended as a complete and exclusive statement of the terms of such agreement. No course of prior dealing between the parties, no usage of trade and no parol or extrinsic evidence of any nature shall be used to interpret, supplement or modify any term, nor are there any conditions to the full effectiveness, of this Guaranty. Subject to the undersigned's Limited Guarantor Termination Right, this Guaranty, and each of its provisions, can only be waived, modified or terminated by a duly authorized written instrument signed by Wells Fargo.

Wells Fargo may in its sole discretion, accept a photocopy, electronically transmitted facsimile or other reproduction of this Guaranty (a "Counterpart") as the binding and effective record of this Guaranty whether or not an ink signed copy hereof is also received by Wells Fargo from the undersigned, provided, however, that if Wells Fargo accepts a Counterpart as the binding and effective record hereof, the Counterpart acknowledged in writing by Wells Fargo shall constitute the record hereof. The undersigned agrees that such Counterpart received by Wells Fargo, shall, when acknowledged in writing by Wells Fargo, constitute an original document for the purposes of establishing the provisions thereof and shall be legally admissible under the best evidence rule and binding on and enforceable against the undersigned. If Wells Fargo accepts a Counterpart as the binding and effective record hereof only such Counterpart acknowledged in writing by Wells Fargo shall be marked "Original" and a security interest may only be created in the Guaranty that bears Wells Fargo's ink signed acknowledgment and is marked "Original".

The undersigned agrees, upon demand by Wells Fargo, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise arising out of or relating to this Guaranty in any way.

Any arbitration proceeding will (i) proceed in a location selected by the American Arbitration Association ("AAA"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the undersigned and Wells Fargo shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "Rules"). If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control. Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein shall be deemed to be a waiver by Wells Fargo of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

The arbitration requirement does not limit the right of Wells Fargo to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in sections (i), (ii) and (iii) of this paragraph.

Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00. Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. The arbitrator will be a neutral attorney licensed in, or a neutral retired judge of the state or federal judiciary of the state in which the arbitration proceeding takes place, in either case with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitrable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of California and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could, pursuant to the Federal Rules of Civil Procedure, the California Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

In any arbitration proceeding discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date and within 180 days of the filing of the dispute with the AAA. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

The resolution of any dispute arising pursuant to the terms of this Guaranty shall be determined by a separate arbitration proceeding and such dispute shall not be consolidated with other disputes or included in any class proceeding.

The arbitrator shall award all costs and expenses of the arbitration proceeding.

To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action necessary to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation. If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the documents between the parties or the subject matter of the dispute shall control. This arbitration provision shall survive termination, amendment or expiration of any of the documents or any relationship between the parties.

MONEY LAUNDERING, SANCTIONS, CORRUPT PRACTICES, AND COMPLIANCE WITH ALL LAWS. The undersigned represents, warrants and agrees that it (1) is not now and will not become the target of any trade or economic sanctions promulgated by the United Nations or the governments of the United States, the United Kingdom, the European Union, or any other jurisdiction in which the undersigned is located or operates (collectively, "Sanctions"), (2) complies now and will at all times comply with the requirements of all laws, rules, regulations and orders of any jurisdiction in which the undersigned is located or doing business, or otherwise is applicable to the

2000 SECURED GUARANTY: November 2019
© 2019 Wells Fargo Bank, N.A. All rights reserved

undersigned, including, without limitation, (a) all Sanctions, (b) all laws and regulations that relate to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto, (c) the U.S. Foreign Corrupt Practices Act of 1977, as amended, (d) the U.K. Bribery Act of 2010, as amended, and (e) any other anti-bribery or anti-corruption laws and regulations, and (3) will not at any time directly or indirectly use any proceeds of any credit extended by Lender for the purpose of (a) providing financing or otherwise funding any targets of Sanctions; or (b) providing financing or otherwise funding any transaction which would be prohibited by Sanctions or would otherwise cause Lender or any of Lender's affiliates to be in breach of any Sanctions.

**GUARANTOR:**

By: _____

Ariel Auerbach Lenning

Date: 04/13/2022

2000 SECURED GUARANTY| November 2019
© 2019 Wells Fargo Bank, N.A. All rights reserved

Exhibit 5
Page 3 of 3



Wells Fargo Practice Finance, a division of Wells Fargo Bank, N.A.
2001 Clayton RD, STE 900
Concord, CA 94520
Phone: (800) 326-0376
Fax: (800) 318-8601



**Guaranty**

In consideration for **Wells Fargo Practice Finance, a division of Wells Fargo Bank, N.A.,** ("WFPF") entering into or acquiring any equipment financing agreement, lease, schedule, promissory note, or other financial transaction of any kind whatsoever, now or at any time hereafter (collectively, the "Obligations") with **Novel Eyes PLLC** ("Customer"), the undersigned unconditionally guarantees to WFPF, its successors and assigns, the prompt payment, observance, and performance when due of all obligations of Customer under the Obligations, regardless of any invalidity or unenforceability thereof. The undersigned agrees to pay to WFPF all attorneys' fees and expenses incurred by WFPF by reason of any default by the Customer under the Obligations and/or to enforce its rights against the undersigned under the terms of this Guaranty.

This Guaranty is a guaranty of prompt payment and performance (and not merely a guaranty of collection). Nothing herein shall require WFPF to first seek or exhaust any remedy against the Customer, its successors and assigns, or any other person obligated with respect to the Obligations, or to first foreclose, exhaust or otherwise proceed against any leased equipment, collateral or security which may be given in connection with the Obligations. Suit may be brought and maintained against the undersigned without joinder of the Customer or any other person as parties thereto.

The undersigned waives any claim or other right which the undersigned might now have or hereafter acquire against the Customer or any person that is primarily or contingently liable on the Obligations or that arises from the existence or performance of the undersigned's obligations under this Guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim or remedy of WFPF against the Customer or any collateral security therefor which WFPF now has or hereafter acquires, whether or not such claim, remedy, or right arises in equity, or under contract, statute, or common law.

The undersigned waives notice of acceptance hereof and all other notices or demands of any kind to which it may be entitled and consents that WFPF may, without affecting the undersigned's liability under this Guaranty, (i) compromise or release, on terms satisfactory to it or by operation of law or otherwise, any rights against Customer and other obligors and guarantors; (ii) grant extensions of time of payment to Customer or otherwise modify the Obligations; and (iii) consent to the transfer, sale or any other disposition of any leased equipment, collateral or security given in connection with the Obligations. If any amount paid at any time on account of any of the Obligations is required to be restored or returned by WFPF as a result of any bankruptcy, insolvency or reorganization of Customer, the undersigned shall be liable under this Guaranty with respect to such amount as if such amount had never been paid.

Upon any default by the Customer in the payment and performance of its obligations under the Obligations, the liabilities and obligations of the undersigned hereunder shall, at the option of WFPF, become forthwith due and payable to WFPF without demand or notice of any nature, all of which are expressly waived by the undersigned.

This is a continuing Guaranty and shall not be discharged or affected by death of the undersigned, shall bind the heirs, administrators, representatives, successors and assigns of the undersigned, and may be enforced by or for the benefit of, any assignee or successor of WFPF to the same extent WFPF may, itself, enforce it.

The liability of the undersigned hereunder is primary and unconditional. If there is more than one undersigned, then the liability of each of the undersigned hereunder shall be joint and several. This Guaranty may be terminated by the undersigned upon 60-days prior written notice to WFPF; **provided, however,** that said termination shall be effective only as to Obligations contracted for and having their inception after the effective date of termination (the "Termination Date") and shall not affect WFPF's rights under this Guaranty arising out of Obligations contracted for or having their inception prior to the Termination Date (including subsequent fundings under a commitment (conditional or unconditional) that WFPF issued before the Termination Date). If any Obligation that was contracted for or had its inception prior to the Termination Date is renewed, extended or modified, with or without adjustment of interest rate or other terms, then such renewed, extended or modified Obligation shall be deemed to have been contracted for and have its inception prior to the Termination Date, regardless of when such renewal, extension or modification occurred. The right of termination set forth in this paragraph is hereinafter referred to as the "Limited Guarantor Termination Right".

The undersigned assumes full responsibility for keeping fully informed of the financial condition of Customer and all other circumstances affecting Customer's ability to perform the Obligations, and agrees that WFPF will have no duty to report to the undersigned any information that WFPF receives about Customer's financial condition or any circumstances bearing on Customer's ability to perform the Obligations.

If the Obligations include a revolving credit feature, the undersigned acknowledges and agrees that the amount of the Obligations may fluctuate and that no reduction in such amount (even to zero) shall terminate this Guaranty or otherwise affect or reduce the liability of the undersigned hereunder.

If any of the undersigned is an entity, said undersigned entity represents, warrants and covenants to WFPF that it has not and will not, without the prior written consent of WFPF, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of its assets, including pursuant to a Division. As used in this Guaranty, a "Division" means a division or any division under Delaware law, including a division pursuant to Section 18-217 of the Delaware Limited Liability Company Act (or any corresponding provision of any successor statute) and a division pursuant to Section 17-220 of the Delaware Revised Uniform Limited Partnership Act (or any corresponding provision of any successor statute), or any comparable event under a different state's laws, pursuant to which the assets, rights, liabilities and/or obligations of an entity are divided among two or more entities. For all purposes of this Guaranty, if pursuant to a Division any asset, right, obligation or liability of any entity becomes the asset, right, obligation or liability of a different entity, then such asset, right, obligation or liability shall be deemed to have been transferred and assigned from the original entity to the subsequent entity on the date such Division becomes effective.

The rights and obligations of the parties hereto shall be governed, construed and interpreted according to the laws of the State of California.

The undersigned hereby unconditionally and irrevocably submits to the jurisdiction of any state or federal court in the State of California in any action or proceeding brought to enforce this Guaranty and agrees that the proper venue for any legal action or judicial proceedings under or pursuant to this Guaranty shall be the County of Alameda, State of California.

This writing is intended by the parties as a final expression of this guaranty agreement and is also intended as a complete and exclusive statement of the terms of such agreement. No course of prior dealing between the parties, no usage of trade and no parol or extrinsic evidence of any nature shall be used to interpret, supplement or modify any term, nor are there any conditions to the full effectiveness, of this Guaranty. Subject to the undersigned's Limited Guarantor Termination Right, this Guaranty, and each of its provisions, can only be waived, modified or terminated by a duly authorized written instrument signed by WFPF.

WFPF may in its sole discretion, accept a photocopy, electronically transmitted facsimile or other reproduction of this Guaranty (a "Counterpart") as the binding and effective record of this Guaranty whether or not an ink signed copy hereof is also received by WFPF from the undersigned, **provided, however,** that if WFPF accepts a Counterpart as the binding and effective record hereof, the Counterpart acknowledged in writing by WFPF shall constitute the record hereof. The undersigned agrees that such Counterpart

2010 GUARANTY | November 2019
© 2019 Wells Fargo Bank, N.A. All rights reserved

Exhibit 6
Page 1 of 2

received by WFPF, shall, when acknowledged in writing by WFPF, constitute an original document for the purposes of establishing the provisions thereof and shall be legally admissible under the best evidence rule and binding on and enforceable against the undersigned. If WFPF accepts a Counterpart as the binding and effective record hereof only such Counterpart acknowledged in writing by WFPF shall be marked "Original" and a security interest may only be created in the Guaranty that bears WFPF's ink signed acknowledgment and is marked "Original".

The undersigned agrees, upon demand by WFPF, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise arising out of or relating to this Guaranty in any way.

Any arbitration proceeding will (i) proceed in a location selected by the American Arbitration Association ("AAA"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the undersigned and WFPF shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "Rules"). If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control. Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein shall be deemed to be a waiver by WFPF of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

The arbitration requirement does not limit the right of WFPF to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in sections (i), (ii) and (iii) of this paragraph.

Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00. Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. The arbitrator will be a neutral attorney licensed in, or a neutral retired judge of the state or federal judiciary of the state in which the arbitration proceeding takes place, in either case with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of California and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the California Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

In any arbitration proceeding discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date and within 180 days of the filing of the dispute with the AAA. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

The resolution of any dispute arising pursuant to the terms of this Guaranty shall be determined by a separate arbitration proceeding and such dispute shall not be consolidated with other disputes or included in any class proceeding.

The arbitrator shall award all costs and expenses of the arbitration proceeding.

To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation. If more than one agreement for arbitration or between the parties potentially applies to a dispute, the arbitration provision most directly related to the documents between the parties or the subject matter of the dispute shall control. This arbitration provision shall survive termination, amendment or expiration of any of the documents or any relationship between the parties.

MONEY LAUNDERING, SANCTIONS, CORRUPT PRACTICES, AND COMPLIANCE WITH ALL LAWS. The undersigned represents, warrants and agrees that it (1) is not now and will not become the target of any trade or economic sanctions promulgated by the United Nations or the governments of the United States, the United Kingdom, the European Union, or any other jurisdiction in which the undersigned is located or operates (collectively, "Sanctions"), (2) complies now and will at all times comply with the requirements of all laws, rules, regulations and orders of any jurisdiction in which the undersigned is located or doing business, or otherwise is applicable to the undersigned, including, without limitation, (a) all Sanctions, (b) all laws and regulations that relate to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto, (c) the U.S. Foreign Corrupt Practices Act of 1977, as amended, (d) the U.K. Bribery Act of 2010, as amended, and (e) any other anti-bribery or anti-corruption laws and regulations, and (3) will not at any time directly or indirectly use any proceeds of any credit extended by Lender for the purpose of (a) providing financing or otherwise funding any targets of Sanctions; or (b) providing financing or otherwise funding any transaction which would be prohibited by Sanctions or would otherwise cause Lender or any of Lender's affiliates to be in breach of any Sanctions.

GUARANTOR:

By: _[signature]_

Michael Robert Lenning

Date: __04/13/2022__

2010 GUARANTY | November 2019
© 2019 Wells Fargo Bank, N.A. All rights reserved